1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF IDAHO

3   JEFFREY D. CONNELL and      )
    JANET CONNELL, husband and  )
4   wife,                       )
                                )  Case No. 1:16-cv-00456-CWD
5           Plaintiffs,         )
                                )
6                               )  Boise, Idaho
        vs.                     )  January 22, 2019
7                               )  1:36 p.m.
    LIMA CORPORATE; LIMA USA,   )
8   INC., an Indiana            )
    corporation; ENCORE MEDICAL )
9   L.P., a Delaware Limited    )
    Partnership d/b/a DJO       )
10  SURGICAL; DJO GLOBAL, INC., )
    a Delaware Corporation; and )
11  JOHN DOE CORPORATIONS I     )
    through V,                  )
12                              )  Motion Hearing
            Defendants.         )
13  _____)

14                  TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE CANDY W. DALE
15        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

16  APPEARANCES:

17  For the Plaintiff:

18          ERIC S. ROSSMAN, ESQ.
            MATTHEW G. GUNN, ESQ.
19          Rossman Law Group, PLLC
            350 9th Street, Suite 500
20          Boise, Idaho 83702

21  Appearances continued on page 2.

22  Recorded by:  A. Tate
    Transcribed by:  Katherine Eismann, CRR, RDR
23                  katherine_eismann@id.uscourts.gov
                    702-409-3556
24

25  Recorded by electronic sound recording, transcript produced by
    mechanical stenography and computer.

1   Appearances continued.

2   For the Defendants Lima Corporate and Lima USA, Inc.:

3
            STEPHEN R. THOMAS, ESQ.
4           ANDREA J. ROSHOLT, ESQ.
            Hawley Troxell Ennis & Hawley LLP
5           877 W. Main Street, Suite 1000
            Boise, Idaho 83701
6
            BRIAN J. HURST, ESQ.
7           Baker McKenzie
            2001 Ross Avenue, Suite 2300
8           Dallas, Texas 75201

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Tuesday, January 22, 2019, 1:36 p.m.)

2                      --oOo--

3            P R O C E E D I N G S

4      COURTROOM DEPUTY:  All rise.

5      The United States District Court for the District of

6  Idaho is now in session, the Honorable Candy W. Dale presiding.

7      THE COURT:  Please be seated.

8      COURTROOM DEPUTY:  The Court will now hear Case

9  CIV-16-456-S-CWD, Connell, et al., versus Lima Corporate, et

10 al.

11     Counsel, please state your appearances for the

12 record, beginning with the plaintiff.

13     MR. ROSSMAN:  Your Honor, Eric Rossman and Matt Gunn

14 with Rossman Law Group PLLC here for the plaintiff in the case,

15 plaintiffs.

16     THE COURT:  Good afternoon.

17     MR. THOMAS:  Your Honor, Stephen Thomas and Andrea

18 Rosholt from Hawley Troxell for the Lima defendants, together

19 with Mr. Hurst, from Baker McKenzie, Dallas, for the Lima

20 defendants.

21     THE COURT:  Okay.  Well, good afternoon.

22     I know that all of you were provided information

23 ahead of time regarding how we'd like to structure the

24 arguments this afternoon.  And Miss Henderson just mentioned

25 that you are fine with the -- the structure.

1    How we'll -- how this will play out is Ms. Tate will

2    send me a Sametime message if it appears that any one of you is

3    over-exceeding your time.

4    I don't intend to cut -- cut counsel off unless,

5    again, you're just kind of going -- going longer than is

6    necessary, and then I will ask you to stop.  So, please try to

7    stay within those time frames and on the -- on those motions.

8    But this is the time for oral argument on seven

9    motions.  Plaintiff's motions include the motion to exclude

10   certain opinions of the expert witness Wright.  That's Docket

11   73.  The motion for partial -- a motion for partial summary

12   judgment regarding affirmative defenses asserted by Lima, which

13   is Docket 98, a motion to add a claim for punitive damages,

14   which is Docket 99.

15   Defendant's motions include the motion for judgment

16   on the pleadings under Rule 12(c).  That's Docket 96.  Motion

17   in limine regarding Dr. Sharlin's rebuttal testimony.  That's

18   Docket 97.  A motion in limine regarding the Burns fracture,

19   which is Docket 106, and the motion for summary judgment which

20   is Docket 104.

21   There were new filings, after 5:00 p.m. on Friday, so

22   that tells me counsel was working feverishly last week perhaps

23   on preparing for the hearing today, Docket 128 and Docket 129,

24   and I have reviewed both of those filings at least briefly.

25   So, according to structure, it is Lima's opening to

1   provide support for the motion for summary judgment and the

2   motion to exclude the Burns fracture evidence.  And so who's

3   going to take the lead on the matter?  Mr. Thomas?

4             MR. THOMAS:  Your Honor, we had planned on

5   Ms. Rosholt arguing the summary judgment.  I will handle the

6   Burns and the Wright -- well, I guess really everything else.

7   But for -- for openers, we're going to allocate about 15

8   minutes of the 20 to Ms. Rosholt, and I'll take the final few

9   minutes on the Burns motion.

10             THE COURT:  Okay.  Sounds good.

11             MR. THOMAS:  Okay.

12             THE COURT:  Ms. Rosholt.

13             MS. ROSHOLT:  Thank you, Your Honor.

14             Can you hear me okay?

15             THE COURT:  I can hear you great.

16             MS. ROSHOLT:  Great.  Thank you.

17             Your Honor, as Mr. Thomas indicated, I'm here to talk

18   about plaintiff -- or excuse me -- Lima defendant's motion for

19   summary judgment, which is bifurcated into two primary parts; a

20   motion pursuant to the Biomaterial's Access Assurance Act,

21   which we're calling the B Triple A, and a motion under state

22   law.

23             Lima appreciates this Court's questions in advance of

24   this hearing, which we received and intend to address.  As part

25   of addressing this Court's questions, we prepared a one -- a

two-sided, one-page handout based exclusively on definitions within the B Triple A and the Idaho Products Liability Reform Act.  Copies have been circulated to counsel as well as provided to this Court.

　　　　　And if this Court doesn't mind, we'll go up on the Elmo.

　　　　　THE COURT:  So, is that how the BAAA is commonly referred to as the B Triple A?

　　　　　MS. ROSHOLT:  So, both the B Triple A and the BAAA. But, for ease of reference, I'm just going to call it the B Triple A or the Act.  Because I'm comparing it to the Idaho Product Liability Act, I thought I'd call it the B Triple A, if that works for the Court.

　　　　　THE COURT:  That works great.

　　　　　MS. ROSHOLT:  Great.

　　　　　THE COURT:  I've been struggling with what to call it in my conversations with Miss Henderson.

　　　　　MS. ROSHOLT:  I, too, struggled.

　　　　　Your Honor, Congress enacted the B Triple A in 1998. As this Court's aware, it contains six statutory provisions found in Title 21 of the US Code.

　　　　　The B Triple A set forth a specific statutory scheme for claimants to follow when they've been injured by an implanted medical device regulated by the FDA.  Important that it -- the B Triple A only applies to implanted medical devices.

1          As we've set forth, but in Section 1603, provides

2     three provisions, which I believe are determinative to the

3     outcome of Lima's motion in this case.  First, Section

4     1603(b)(1) provides that the BA -- the B Triple A applies to

5     any civil action brought by a claimant, whether federal or

6     state, on the basis of any legal theory for harm allegedly

7     caused directly or indirectly by an implant.  It is not

8     disputed that at issue in this case is an implant regulated by

9     the FDA.

10          Second, Section 1603(a)(2) expressly provides,

11     notwithstanding any other provision of law, a federal or state

12     court, in which an action is governed by the B Triple A, is

13     pending in connection with a motion under Section 1605 or 1606

14     of this title to use the procedure set forth in this chapter.

15     1605 concerns dismissal or summary judgment.  1606 addresses

16     subsequent impleader of a dismissed biomaterials suppliers.

17          Finally and third and most importantly, Section

18     1603(c)(1) provides that the B Triple A supersedes any state

19     law regarding recovery for harm caused by an implant and any

20     rule or procedure applicable to a civil action to recover

21     damages for such harm.

22          Your Honor, in this case, Mr. Connell has brought a

23     civil action for harm allegedly caused by an implant.  As such,

24     1603 applies.  And then I'm going to specifically address the

25     questions raised by this Court.

1          We set forth the demonstrative in this court to

2     explain the specific statutory definitions as set forth in the

3     B Triple A as opposed to those that are found in the Idaho

4     Product Liability Reform Act and under common law.  As set

5     forth in 1603, the B Triple A, in their definitions, supersede

6     any state law.  It not only supersedes state law but any

7     procedure.

8          The B Triple A, the first question raised by this

9     Court is how an integrated three-part hip system can be

10    considered separate component parts under the B Triple A.  Your

11    Honor, the B Triple A distinguishes between what's called

12    component parts or manufactured parts for the finished implant

13    and the actual finished implant.

14         The FDA regulatory scheme and specifically the B

15    Triple A define what it means to manufacture an implant but

16    also what it means to be the manufacturer of an implant, which

17    is at issue in this case.

18         THE COURT:  Is that the distinction that you're

19    making is that Lima manufactured the two component parts and

20    yet DJO was the manufacturer of the device?

21         MS. ROSHOLT:  That's correct, Your Honor.  That's --

22    that's one key important part that we're -- point that we're

23    making, and it's vitally important for purposes of B Triple A.

24    And in addition to the handout, I'm going to walk the Court

25    through what's in -- what's in the record as to how these

component parts fit together and the implant system, the hip

system implanted in Mr. Connell in this case.

But first, I think it starts with an idea of what is

a biomaterials supplier.  The B Triple A identifies a

biomaterials supplier as an entity that provides raw materials

or supplies component parts.  The question by the Court relates

to this idea of manufacture.  And as I indicated, the term

manufacture has specific meaning.

At provision three, Section 1602.6 defines

specifically who is the manufacturer of an implant and provides

that the term manufacturer means any person who, with respect

to an implant; A, is engaged in the manufacture, preparation,

propagation, compounding, or processing of the implant; and, B,

is required to register and is required to include as a list of

the devices filed with the secretary, the FDA, the implant.

The term engaged in the manufacture, preparation,

propagation, compounding, or processing is also defined,

specifically referenced in 360(a)(1) of the FDCA and

incorporated into the term consistently with the B Triple A.

An implant -- the Section 360(a)(1) of Title 21

provides that the term manufacture, preparation, propagation,

compounding, or processing shall include repackaging or

otherwise changing the container, wrapper, or labeling of any

drug package or device package in furtherance of the

distribution of the drug or device from the original place of

1    manufacture to the person who makes final delivery or sale to

2    the ultimate consumer or user.

3              And this term is consistent -- it's not only

4    consistent with the B Triple A, but it's consistent with what

5    happened in this case.  In this case, Lima and DJO entered into

6    a contractual supply agreement.  The contractual supply

7    agreement required Lima to supply independent component parts

8    to DJO.

9              Those component parts left Lima's control and the

10   risk passed at a shipping dock in Italy.  Those component parts

11   were then received by DJO in Austin, Texas.  They were then

12   inspected.  They were then sterilized.  They were then put in a

13   DJO container.  They were then provided with a DJO label.

14             DJO is the party that obtained FDA 510(k) approval.

15   DJO is the party that listed and registered the device with the

16   FDA.  The B Triple A provides a specific statutory scheme.  It

17   provides that the claimant or the plaintiff in this case is to

18   sue the manufacturer as defined.

19             And then there are specific processes for when a

20   biomaterials supplier may be liable.  And I'm going to walk

21   through some of the case law as well.

22             But there seemed to be an issue, Your Honor, as to

23   what is the implant or the component parts.  I will draw this

24   Court's attention to Docket 101-2, and I've got copies should

25   the Court not have easier access of reference.

1          Docket -- Docket 101-2 is a copy of the instructions

2     for use prepared by DJO.  Those instructions are the

3     instructions that must be contained or included in each

4     separate package.  Those -- the instructions for use make clear

5     a couple of things.

6          First, the implant.  The implant is a DJO surgical

7     modular revision hip system with a DJO surgical acetabular cage

8     as set forth in the very top portion of the instructions for

9     use that accompany the implant.

10         On Section 2, identifies product description and

11    implant materials.  It defines the device as a modular revision

12    hip stem, a modular revision neck, an acetabular cage, and

13    explains that the system can be used with a DJO surgical CoCr

14    or ceramic femoral head and that the DJO surgical acetabular

15    cages can be used with any DJO surgical acetabular liner.

16              THE COURT:  The acetabular cage --

17              MS. ROSHOLT:  Acetabular --

18              THE COURT:  -- that came --

19              MS. ROSHOLT:  -- cage --

20              THE COURT:  That came from --

21              MS. ROSHOLT:  DJO.

22              THE COURT:  That came from DJO, but where did it come

23    from -- how did it get to DJO?

24              MS. ROSHOLT:  Your Honor, I -- I don't know.

25              THE COURT:  Okay.  It did not come from Lima?

1          MS. ROSHOLT:  That's correct.  That's correct.  A

2    number of these component parts -- and I appreciate the Court's

3    question.

4          THE COURT:  Could either of the component parts, as

5    you call them, from Lima been implanted into a human being in

6    the state it was when it left Lima's dock?

7          MS. ROSHOLT:  And that's a great question.  The

8    answer is no, Your Honor.  There were a number of manufacturing

9    processes as set forth in the specific definition that needed

10   to occur.

11         Included product labels -- in order -- in order for a

12   product -- it had to be cleared by the FDA.  That product had

13   to be contained within a package.  It had to have a label.  At

14   the time those products left the -- it's specific components.

15   And another important part is the components didn't leave Lima

16   in an assembled form.

17         They were specific components, stems, and proximal

18   bodies, or the necks that we're calling them, that left Lima's

19   shipping docks.  Those component parts were then received by

20   DJO in Austin.  They received the final manufacturing process,

21   which is an important step.

22         It's -- it's why DJO is entitled to hold out as the

23   manufacturer for the FDA.  It's why DJO is required to list and

24   register the device with the FDA.  And those include the

25   important parts of sterilizing, packaging, and putting with the

1   implant the -- the instructions for use, which I've just

2   identified.

3              THE COURT:  In the instructions for use, not to -- I

4   am getting over into other time, the other motion -- oh.

5         (Cell phone ringing.)

6              MR. GUNN:  I think -- pardon me, Your Honor.

7              THE COURT:  Does that music have a special meaning,

8   Mr. Gunn?

9              MR. GUNN:  I -- yes, Your Honor.  That -- that was

10  the 10-minute bell.

11             MS. ROSHOLT:  Okay.  Thank you.

12             MR. GUNN:  Sorry.

13             THE COURT:  Oh, that was the 10-minute bell.  Okay.

14             The instructions for use -- it's part of the

15  plaintiff's claim that the instructions for use, that Lima

16  should have done something to have DJO modify the instructions

17  for use to have the contraindication for the BMI?

18             MS. ROSHOLT:  And what is the question -- specific

19  question, Your Honor?

20             THE COURT:  Is that -- is my understanding correct?

21  That that's -- the IFUs that you're making reference to are the

22  IFUs that DJO created?

23             MS. ROSHOLT:  The instructions for use I'm making

24  reference to are the instructions for use that DJO created and

25  that the FDA reviewed and approved.  Correct.

1          THE COURT:  And those are the same IFUs that

2    plaintiff's claiming should have been -- should have included

3    the contraindication based on BMI?

4          MS. ROSHOLT:  That's correct, Your Honor.

5          It is undisputed in this record, Your Honor, that

6    Lima is not the manufacturer of the implant for purposes of the

7    B Triple A.  It -- the definition of the implant, which has

8    specific meaning, would have required them to manufacture,

9    which we do not disagree that they manufactured component

10   parts, but also they would be required to list the device.

11         The plaintiffs don't -- don't touch on, but, of

12   course, Lima is not the seller of the implant, because they are

13   not the final implant device manufacturer.  But the important

14   part is when is a -- when is a biomaterials supplier liable

15   under the B Triple A.

16         Section 1604 supplies that rule.  It provides that a

17   biomaterials supplier is liable if it is the manufacturer of

18   the implant, as provided in subsection B, which is addressed in

19   the next portion.  It provides that it is liable if it is the

20   seller, which it's not disputed in this record it is not.  And

21   it provides it is liable if it supplied raw materials or

22   component parts -- and I will note the plural -- for the

23   implant that failed to meet applicable contractual requirements

24   or specifications.

25         Plaintiffs have not even introduced or argued -- they

haven't introduced any evidence or argued that Lima failed to
meet the applicable contractual requirements or specifications
with regard to the supply agreement and its agreement with DJO.
Therefore, plaintiffs have failed to establish that Lima's
liable pursuant to the Biomaterial's Access Assurance Act or
the B Triple A.

In order to be liable as the manufacturer of that
device, as set forth, they would have to register the device or
be subject to a declaration by the FDA requiring them to list
the device.  We've introduced the declaration of Michele
Pressacco, record evidence testifying that Lima has never been
the subject of a declaration by the FDA.

This chart answers the Court's second question which
is who is and who is not a product manufacturer/seller for
purposes of the Idaho product liability law as well.  And then
I'd just like to walk through a couple of the cases quickly and
then cede the rest of my time to Mr. Thomas.

Your Honor, in *Daley v. Smith & Nephew*, a 2018 case,
the Court considered whether a component part manufacturer, in
this case, a manufacturer who designed a -- the femoral neck of
the implant that fractured in that case -- it's no different
than the component part here, the stem manufactured by Lima --
could be liable under the B Triple A.  The plaintiffs argued
that because the manufacturer in that case designed the femoral
neck, they were liable.

1    The Court, looking to the express provisions of the B

2    Triple A, held otherwise.  Applying the specific definitions in

3    the B Triple A, the Court said that the -- that Congress set

4    forth the specific players in component manufacturing and did

5    not provide or accept a biomaterials designer as opposed to --

6    as a manufacturer although they could have.

7    The same result occurred 10 years earlier, in both

8    *Whaley v. Morgan Advanced Ceramics*, which is a District of

9    Colorado case, and *Jones v. Blackstone Medical*, which is a

10   District of Texas case.

11   In *Morgan*, the defendant there actually manufactured

12   the entire femoral head that fractured in that case.  Again,

13   the component part that fractured was manufactured by a

14   component manufacturer of an S-ROM system that was brought to

15   market by Johnson and Johnson, later DePuy.

16   The Court granted the biomaterial supplier's motion

17   to dismiss in that case, finding that the statutory scheme

18   provided for dismissal.  And then, if it was found, after final

19   judgment entered against the manufacturer, that Morgan Advanced

20   Ceramics was negligent, the manufacturer could implead in

21   Morgan Advanced Ceramics.  In this case, the plaintiffs have

22   decided to settle, for whatever reason, with the manufacturer.

23   *Jones v. Blackstone Medical*, another case directly on

24   point, in that case, the main -- the component part

25   manufacturer manufactured a top-locking plate of a cervical

1    device that was implanted.  That cervical plate broke causing

2    significant injuries to Mrs. Jones.  Mrs. Jones sued the party

3    who registered and listed the device, also sued DiSanto, who

4    manufactured the implant's top-locking plate.

5           The Court also granted DiSanto's motion to dismiss,

6    finding that the fact -- excuse me.  In that case, Jones

7    specifically argued, as is argued here, DiSanto defectively

8    designed, marketed, and manufactured the top-locking plate.

9    Further went on to explain, they complained that the

10   top-locking plate was unsafe for its intended purpose and not

11   adequately tested.  The Court granted dismissal under the B

12   Triple A recognizing that the statutory scheme controlled.

13          Again, the B Triple A sets forth who is and who is

14   not engaged in the manufacture of an implant for purposes of

15   the B Triple A.  It sets forth a specific statutory scheme to

16   hold the manufacturer, here DJO, liable.  And if plaintiffs

17   obtain a judgment against DJO, DJO can then look to Lima in the

18   event it feels as though Lima was negligent in the manufacture.

19   We would argue --

20          THE COURT:  So, could -- and that's where I have some

21   questions.

22          MS. ROSHOLT:  Yes, Your Honor.

23          THE COURT:  So, if DJO had not settled out with the

24   plaintiff in this case, could DJO -- DJO have counter or

25   crossclaims against Lima?

1          MS. ROSHOLT:  No, Your Honor.  Section 1606 sets

2    forth the procedure for -- for holding Lima liable.  It

3    requires that after a final judgment would be entered, that

4    that DJO would attempt to implead Lima in the case.

5          THE COURT:  So only after final judgment.

6          MS. ROSHOLT:  That's correct, Your Honor.

7          THE COURT:  Okay.  Thank you.

8          MS. ROSHOLT:  Thank you.

9          THE COURT:  Mr. Thomas.

10         MR. THOMAS:  Your Honor, thank you.

11         You've seen a lot of briefing on the Burns motion, so

12   I'll try to be brief.  Perhaps the most important things are to

13   talk about the obvious things.  Here we have a product

14   liability case with no product.  We did plead spoliation,

15   however we did not tee it up as a motion, because we take

16   plaintiffs at their word.

17         There was no malintent on their part in losing this

18   piece of evidence.  But the fact remains, it was their

19   property, it is evidence, it is the best evidence, and it is

20   missing.  And that creates serious problems both practical and

21   jurisprudential to a just trial in this case as to a product

22   defect.

23         The effort to end run that problem, as we all know,

24   is to cross-reference the Burns device.  And I'm going to talk

25   about it for a moment.  But before I do, let me decouple it

from the motion just argued by Ms. Rosholt.  Whether this
motion in limine is granted or denied really does not tie to
that MSJ on common law product liability.  And the main reason
is that it's opposite of the usual situation.

In the usual situation, we have a plaintiff trying to
prove a defect against a product, and he looks out to another
incident or accident and says, "There is evidence that's
conclusive that that was a defective product.  We are going to
import that and build a bridge over to case number one; and,
therefore, persuade the jury in case one that their product was
also defective."

But here, in case number two, the Burns matter, the
same experts having appeared by plaintiffs in both sides,
the -- it's critically important to note that their core lead
expert, the metallurgist, Cornelissen, did cannot say and did
not say that the Burns device was defective.  And so they can't
really import anything of usefulness into this case from that
other case.

THE COURT:  But doesn't -- doesn't Idaho law support
that a defect can be proved by circumstantial evidence, and
that's what plaintiff is relying on with regard to the fact
that the stems came from the same lot?

MR. THOMAS:  Your Honor, the answer is yes and more.
You can use circumstantial evidence, but you have to meet
several hurdles -- I'm now shifting back to the MSJ -- proving

1 the absence of reasonable secondary causes and the absence of

2 misuse.

3          And that's -- that then permits you, if you can do

4 that, then you can look to circumstantial evidence maybe.  But

5 the Rule 403 overlay is the final piece that the Court has to

6 look at, and that's where the -- the most of the legal action

7 is on these kinds of motions.  As in the *Miller versus Four*

8 *Winds*, the Court's obviously been here before.

9          But the point I'd like to make is that there is no

10 substantial similarity.  These two cases could not be more

11 different.  For one thing, we -- we have, in one case, a -- an

12 explanted device, which, of course, for whatever reason, we

13 can't see it, but it exists.  And in this *Connell* case, no

14 device.  The two patients, Mr. Burns and Mr. Connell, are very,

15 very different people with different health profiles and

16 different comorbidities.

17          Mr. Connell is overweight, but Mr. Burn is

18 super-obese, morbidly obese, an absolutely huge individual,

19 according to the plaintiff's evidence.  He also had sepsis,

20 which is a contraindication.  And as per their own biomechanic,

21 Dr. Truman, the proper implant for Mr. Burns should have been a

22 custom implant not an off-the-shelf implant.

23          And so finally, we have the activity level.  We have

24 really no evidence as to Mr. Burns' activity level, but we do

25 know Mr. Connell was quite active.  He continued playing pickup

1    basketball in the same gym where he went to high school with

2    other high school players on weekends and was a karate black

3    belt as well.  So, these are --

4                THE COURT:  But aren't --

5                MR. THOMAS:  -- very -- I'm sorry.

6                THE COURT:  Aren't these all facts or circumstances

7    that will be brought out by the expert witnesses such that the

8    jury can determine what difference that makes in determining

9    whether --

10                MR. THOMAS:  Well, but -- yeah, by default.  If we

11   have to cross-examine, we will.  But that leads to another

12   problem from the perspective of the bench, and that's case

13   management.

14                We know that not only is 403 concerned about

15   substantial similarity, but the reason is they need to worry

16   about jury confusion and about collateral issues.  And here we

17   have a host of things.  To be quite frank, Your Honor, if we go

18   off into the Burns direction allowing it into this courtroom,

19   then we have what the Court cases call mini-trials problem.

20                And we have created a huge mini-trial problem, not

21   just for the trial of this case, but effectively a stay to give

22   this defendant a mini-discovery.  And it involves things like

23   the right to depose Mr. Burns, the right to get all of his

24   medical records, the right to analyze the device they still

25   haven't produced to us.

1            All of that stuff would have to be done.  And

2   frankly, Your Honor, I think we would have the right to take a

3   fresh look at the exponent folks who've already analyzed this

4   device.  And I know we've been there before, but I'm just

5   saying that the risk of mini-trials and of collateral confusing

6   issues is huge.  And it also runs square into Mr. Burns's

7   rights to privilege and privacy under state and federal law.

8            If we go out with a subpoena to take his deposition

9   and get all of his medical records, we might very well be met

10  by a motion to quash that could succeed.  So, the possibility

11  of confusing the jury and prejudicing the jury with a radically

12  different patient health situation and so forth, is, in my

13  view, hopefully the Court's, a bridge too far, and it would

14  mess up this trial in a great, great way.

15           Last, we have complained, under Rule 26, that they

16  never identified this witness or this evidence.  They never

17  produced it.  But as recently as two weeks ago, when they filed

18  their Docket Number 116-2, page 19, we now are told that not

19  only will they refer to the Burns explant, but they want to

20  bring to it trial.

21           Now, what?  They have never produced it, Your Honor.

22  Now they're saying they are going to bring this thing to trial?

23           THE COURT:  Yeah, well --

24           MR. THOMAS:  We never had a chance to see it or

25  examine it.  That's unfair.

1          THE COURT:  Well, we can -- we can take that up later

2     if that, in fact, is the case, so --

3          MR. THOMAS:  Understand.  Your Honor, I'm out of

4     time.  Thank you.

5          THE COURT:  Okay.  Mr. Rossman.  Are we going to hear

6     from Mr. Gunn, today, too?

7          MR. ROSSMAN:  It will just be me, Your Honor.

8     Unfortunately, I wish I deferred some off to Mr. Gunn.  This is

9     quite a -- quite a lot of information.

10          Your Honor, I don't know where to start here.  I

11     think --

12          THE COURT:  Well, maybe start with that B Triple.

13          MR. ROSSMAN:  Okay.  I appreciate that direction.

14          The B Triple A, I appreciate opposing counsel's

15     arguments.  But if -- really, what they're asking the Court to

16     do is evaluate the application of a preemption statute in a

17     vacuum, to disregard the intent and policy and purpose behind

18     the statute, to disregard the fact as to how the statute

19     applies and when it applies, and to disregard one of the most

20     basic premises of statutory construction in this country, and

21     that is a premise that disfavors preemption.

22          Unless Congress unambiguously preempts something,

23     preemption is to be strictly construed against preemption or a

24     statute is to be strictly construed against preemption.  And I

25     think that's a very important premise as we move forward with

1    this argument.

2            Opposing counsel wants to make a circular argument

3    about whether or not Lima was a manufacturer in this case.  And

4    my point to the Court is that we simply don't even get to that

5    question.  The first question, in determining whether or not

6    there's preemption under the B Triple A, is whether or not Lima

7    was a biomaterials supplier.  And if they are not a

8    biomaterials supplier, the statute does not apply.  The inquiry

9    ends.

10           If they are a biomaterials supplier, there still is

11   an exclusion from preemption if they are a manufacturer as

12   defined in the statute.

13           But the important thing is, there is no definition in

14   the statute whatsoever as to the term "manufacture."  There is

15   a definition as to manufacturer, but the only use of the term

16   manufacturer, within the entire statute, is whether or not

17   there's an exclusion for someone who is already determined to

18   be a biomaterials supplier from the preemption provisions of

19   the statute.

20           They want to -- and so by doing that, they refer to

21   the -- the definition of a manufacturer within the statute,

22   which then makes reference to another statute as to whether or

23   not they are engaged in the manufacture, preparation,

24   propagation, compounding, or processing.

25           And then they refer back over to 21 USC 360, which

1   defines the term manufacture, preparation, propagation,

2   compounding, or processing to also include repackaging or

3   changing the container.

4          Now, what's very important is that Congress included

5   the repackaging and changing of the container activity only in

6   the definition of five terms; manufacture, preparation,

7   propagation, compounding, or processing.

8          So, effectively, what Congress has said, that -- that

9   collective term of those five different items can include

10  repackaging.  Congress has never, opposing counsel has not

11  cited to any, and there is not a single case that says that the

12  term "manufacture," when the Court is deciding whether or not

13  someone is a biomaterials supplier, includes also the

14  preparation, propagation, compounding, or processing.

15         That only applies to the exclusion from someone who

16  is already determined to be a biomaterials supplier from the

17  preemption provisions of the statute.

18         And why is that important?  Why do we even have this

19  statute?  Well, the obvious purpose of this statute is that if

20  someone is truly a component supplier, they supply only a piece

21  of an integrated whole product, they should not be held

22  responsible for a failure in somebody else's development of a

23  system to include that particular product, because it's only a

24  piece.  It's not the product itself.

25         But if you look at the FDA clearance that they

1   obtained in this case, if you look at their marketing

2   materials, if you look at the affidavit of Caleb Creagan as to

3   how this particular device was marketed, it was marketed as a

4   system.  And if you simply google this system, or Zimmer's

5   system, or Medacta's system, or any other manufacturer's

6   system, it includes exactly what is included in this particular

7   system.  That is a proximal body and a femoral piece including

8   a femoral head.  That is what is included in every device,

9   every piece of that system as marketed or as manufactured by

10  Lima.

11          THE COURT:  I thought the marketing was done by DJO.

12          MR. ROSSMAN:  DJO marketed the product --

13          THE COURT:  And also that --

14          MR. ROSSMAN:  -- as a Lima system.

15          THE COURT:  DJO -- and DJO registered with the FDA,

16  not Lima.

17          MR. ROSSMAN:  That's true.  I'm not -- I'm not

18  arguing that -- that Lima is a manufacturer as defined in the

19  statute -- in the B Triple A, because it's not.  Lima did

20  not -- was not responsible for the FDA clearance.

21          What I'm arguing is you don't get to the question as

22  to whether or not Lima was a manufacturer under the B Triple A

23  until you've answered the first question.  Are they a

24  biomaterials supplier?  Because if they are not a biomaterials

25  supplier, they are not -- the B Triple A does not address them.

1    Does not cover them.

2                 THE COURT:  Why are they not a biomaterials supplier?

3                 MR. ROSSMAN:  Because as we read the statute itself,

4    it defines a biomaterial's supplier as an entity that directly

5    or indirectly supplies a component part or raw material for use

6    in the manufacture of an implant.  The -- a component part has

7    been defined as a piece of a total product.

8                 In this case -- and you have to understand, Your

9    Honor, why the B Triple A is there.  Just as I said before, if

10   they are truly a biomaterials supplier -- in other words, for

11   example, in this case, Lima, if it only supplied the femoral

12   stem but didn't supply the proximal body that is attached to

13   the femoral stem, in fact, if DJO used somebody else's proximal

14   body that was not appropriate for that particular femoral stem,

15   Lima had no control over that.  They should not be -- they

16   should have preemption.  They should not be -- they should have

17   immunity.  They should not be sued for that.

18                But in this particular case, they manufactured both.

19   The entire system was manufactured by Lima.  They are not a

20   component part -- manufacturer of a component part or raw

21   material or a piece of the total product in this particular

22   case.

23                THE COURT:  Would the system have worked without the

24   screw?

25                MR. ROSSMAN:  What screw?

```
 1                 THE COURT:  My understanding --

 2                 MR. ROSSMAN:  The screw was manufactured by Lima.

 3                 THE COURT:  -- there was a screw -- my understanding

 4      was there was a screw, but it wasn't manufactured by Lima.

 5      Or --

 6                 MS. ROSHOLT:  Sorry.

 7                 MR. ROSSMAN:  I'm --

 8                 THE COURT:  Maybe Ms. Rosholt can clarify.

 9                 MR. ROSSMAN:  I don't know.  All I can tell you, Your

10      Honor, if you look at the marketing materials, if you look at

11      the FDA clearance, if you look at any other hip -- revision

12      modular hip supplier's advertising and their product, and if

13      you look at Caleb Creagan's affidavit, it makes it clear that a

14      revision modular hip system includes the stem and the proximal

15      body.

16                 The screw is not part of the system.  It's not

17      advertised as part of the system.  It's not -- it's not

18      advertised as anybody else's part of their system.  A simple

19      google search will tell you that.  The system that they had FDA

20      clearance on was the hip system.  It's the stem.  It's the

21      proximal body.

22                 THE COURT:  When you say "they," they was DJO.

23                 MR. ROSSMAN:  DJO with the assistance, by contract,

24      of Lima.  And what Lima sold is exactly what it sells

25      throughout other parts of the world.  It's not anything
```

1    different than what DJO was selling domestically.

2            THE COURT:  So, the Lima revision proximal body and

3    the Lima revision distal stem, is it your position that those

4    two created the system?

5            MR. ROSSMAN:  That's the system, Your Honor.  And if

6    you look at their marketing materials, if you pull them up on

7    the Internet, that is the revision modular system.

8            THE COURT:  So --

9            MR. ROSSMAN:  If you look at Zimmer's revision

10   modular system, it's exactly the same thing.  If you look at --

11           THE COURT:  When they -- when they left Lima, when

12   the proximal body and the distal stem left Lima in Italy and

13   arrived at -- for -- to DJO, were they in the state in which

14   they could have been implanted into a human being?

15           MR. ROSSMAN:  The only things left were cleaning and

16   packaging.  There was no manufacturing done to that product.

17           THE COURT:  There was labeling.

18           MR. ROSSMAN:  And labeling.

19           THE COURT:  And including --

20           MR. ROSSMAN:  But that's not --

21           THE COURT:  -- the screw.

22           MR. ROSSMAN:  -- manufacturing.

23           THE COURT:  And including the screw that we don't

24   know where it came from.

25           MR. ROSSMAN:  I think you are talking -- are you

1    talking about the acetabular cage?

2              THE COURT:  Yes.

3              MR. ROSSMAN:  Well --

4              THE COURT:  That's --

5              MR. ROSSMAN:  -- the acetabular cage is something

6    different.  Acetabular cage is never part of a hip system.  No

7    manufacturer, that I've ever seen in my entire life, nor that

8    could be located, nor is there any evidence in this case -- no

9    manufacturer markets a revision modular hip system to include

10   an acetabular cage.  The system is exactly what they had

11   cleared by the FDA as a system, the system is exactly what they

12   purchased from Lima, and the system that was put in

13   Mr. Connell's body was exactly the same system that Lima

14   provided/sold to DJO with the only addition being cleaning,

15   labeling, and packaging.

16             THE COURT:  So, if I understand, your argument is

17   that both Lima and DJO are manufacturers under the definition

18   in Idaho's product liability statute.  And we don't -- we

19   should just disregard the B Triple A.

20             MR. ROSSMAN:  Disregard what?

21             THE COURT:  The B Triple A.

22             MR. ROSSMAN:  We -- you should disregard --

23             THE COURT:  Because --

24             MR. ROSSMAN:  -- the --

25             THE COURT:  Because Lima is not a biomaterials

1   supplier.

2          MR. ROSSMAN:  And because none of the policies

3   underlying the B Triple A apply to Lima.  They apply to Lima if

4   they provided just the stem that was included with somebody

5   else's product as a system.  But they produced the entire

6   system.  They are responsible for the integrity of the entire

7   system.

8          There is no reason why B Triple A should provide

9   preemption.  And if we're strictly construing the statute, we

10  look at the definition of biomaterials supplier, and it does

11  not include a definition of manufacture, of a component

12  manufacture or the term manufacture.

13         And if, in fact, Congress -- again, strictly

14  construing that statute -- intended manufacture to be the same

15  as is -- is included in the term manufacturer, then Congress

16  would have included, when it defined a biomaterials supplier,

17  the additional terms of preparation, propagation, compounding,

18  and processing.

19         They included it later in the statute when they talk

20  about an exclusion from the preemption, that a biomaterials

21  supplier would have, but they don't talk about it when they are

22  defining what a biomaterials supplier is.

23         And I think that's important, because Congress would

24  have intended that this statute apply only to component

25  suppliers.  But if somebody -- if DJO, for example,

1   manufactured the proximal body with Lima's femoral stem, and

2   then DJO went and got the FDA clearance, Congress wanted a

3   pretty expansive coverage of the term manufacturer as it would

4   be an exclusion from the preemption provided to a biomaterials

5   supplier.

6           So there are a lot of reasons why Congress -- we have

7   to assume that Congress did not intend that the term

8   "manufacture" includes simply packaging of a product or

9   cleaning of a product.  They are looking at the -- you have to

10  keep that in mind in light of strict construction against

11  preemption and in light of the policies underlying the statute

12  itself.

13          THE COURT:  Did -- is it uncontested that DJO also

14  labeled the stem and the proximal body?

15          MR. ROSSMAN:  Well, I don't know what labeling they

16  did.  The labeling, my understanding, is all the packaging.

17          THE COURT:  But they did label.

18          MR. ROSSMAN:  They passivated, which is a form of

19  cleaning of the -- of the system itself that they purchased

20  from -- from Lima.  But they didn't manufacture anything.  They

21  didn't -- they didn't modify.  They didn't alter.  They didn't

22  construct any piece of that particular system.

23          THE COURT:  But without the sterilization or the --

24  you had another word.

25          MR. ROSSMAN:  Passivation.

1          THE COURT:  Passivation, those parts or the system

2     itself could not have been implanted; correct?

3          MR. ROSSMAN:  Well, certainly DJO could have had Lima

4     passivate and clean, but the problem is it needed to be done

5     domestically, and so they did it domestically.

6          I don't know exactly why or how, but I guess I'm

7     going to go back to my original emphasis.  And if you take the

8     common-sense definition of manufacture, when Congress didn't

9     include any other definition, if you take the common sense,

10    Webster's dictionary definition of manufacture, cleaning and

11    passivating is not manufacturing.

12         They didn't manufacture any component part of this

13    system.  The entire system, again, was manufactured by Lima.

14    And there's absolutely -- and I would also emphasize, Your

15    Honor, that a ruling that this -- that the B Triple A covers

16    Lima or preempts Lima, you think about all of the hip

17    litigation.

18         The millions -- the thousands of cases of hip

19    litigation that are out there.  It effectively would be

20    stating -- it effectively would stand for a premise that a

21    foreign manufacturer can really never be sued in the United

22    States, because I can't imagine a situation where one would be

23    less of a manufacturer than Lima.

24         So, you have to also consider the -- the

25    ramifications in understanding, really, what Congress's intent

| | |
|---|---|
| 1 | was in establishing the B Triple A, was not to provide immunity |
| 2 | to foreign manufacturers.  It was to provide preemption to |
| 3 | foreign manufacturers who only make a piece but are not |
| 4 | responsible for the -- for the entire system or the integrity |
| 5 | of the entire system that is marketed and sold. |
| 6 | THE COURT:  Did -- do you know, did DJO inspect |
| 7 | the -- the items -- I'll call them items -- when they received |
| 8 | them as indicated in the 2009 supply agreement?  Did they do |
| 9 | all the things that they indicated they would do? |
| 10 | MR. ROSSMAN:  Well, obvious -- I guess I wasn't |
| 11 | there, so I -- I don't know -- |
| 12 | THE COURT:  Let me ask a better question. |
| 13 | MR. ROSSMAN:  -- whether they did or didn't. |
| 14 | THE COURT:  Do you have any evidence -- |
| 15 | MR. ROSSMAN:  I don't have any evidence -- |
| 16 | THE COURT:  -- that suggests that -- |
| 17 | MR. ROSSMAN:  -- that they didn't. |
| 18 | THE COURT:  -- that they didn't comply with the |
| 19 | supply agreement? |
| 20 | MR. ROSSMAN:  No.  But again, what you're talking |
| 21 | about there is you're getting -- you're getting past the |
| 22 | determination as to whether they are a biomaterials supplier, |
| 23 | because you don't even ask that question until you've |
| 24 | determined that they are, in fact, a biomaterials supplier. |
| 25 | THE COURT:  Okay.  One more question about the B |

1   Triple A, and then I'll let you move to the other aspects of
2   the motion.
3          Do you concede that Lima was not required to register
4   with the FDA?
5          MR. ROSSMAN:   Lima was not required --
6          THE COURT:   The secretary?
7          MR. ROSSMAN:   -- well, it depends on what you're
8   talking about, Your Honor.   I -- I don't concede that.   I
9   concede that the supply agreement required them to actively
10  participate in assisting DJO with obtaining FDA clearance.
11         I think that the affidavit of -- the declaration of
12  Dr. Sharlin demonstrates that DJO -- or that Lima did retain
13  some responsibilities from an FDA regulatory standpoint,
14  especially when they know there are false representations being
15  made to the FDA.
16         But as far as primary responsibility for the filings
17  and the handling of the FDA clearance for the product, yes.
18  Under federal law, DJO is, in fact, the manufacturer for FDA
19  regulatory purposes.
20         THE COURT:   Thank you.
21         MR. ROSSMAN:   So, opposing counsel really didn't
22  address in oral argument the other parts of their motion for
23  summary judgment.   Unless the Court has questions on that, I'm
24  just going to go back to the standpoint that we made I feel
25  fairly clearly in our briefing, and that is that there's a

1   prima facie case here.  The prima facie case that it was

2   defective.

3           We don't have to have expert testimony.  We can rely

4   on circumstantial evidence, and we don't have to completely

5   disprove any other potential cause of the injury.  That's a

6   factual question best decided by the jury.

7           THE COURT:  Do you want to add anything in response

8   to Mr. Thomas's motion in limine regarding the Burns evidence?

9           MR. ROSSMAN:  Yes, I do.  And the Burns evidence, the

10  *Sliman versus Aluminum Company of America* case, I think, makes

11  it quite clear that evidence of other accidents may be

12  admissible in a product liability case in the state of Idaho.

13  They need not be identical.  They need only be substantially

14  similar.

15          And I can imagine very few situations where another

16  accident would be less substantially similar than what we have

17  in this case.  You never see -- and I think what Mr. Thomas is

18  really asking the Court to do is exercise a requirement of --

19  that it be identical.

20          It doesn't have to be identical.  It's the same exact

21  stem.  It's the same size stem.  It's the same dimension stem.

22  It's manufactured by the same manufacturer.  It's fractured in

23  the exact same location, with, according to my experts, a

24  similar if not identical fracture pattern.  It lasted way --

25  they both lasted way less period of time than they should have.

1    They should never fracture within the 10- to 15-year life

2    expectancy of a hip -- of a hip system.  That's clear in the

3    record.

4            They were manufactured from the exact same

5    manufacturing lot.  Of 51 devices that were manufactured, these

6    are two of them.  That's a -- just -- if you just look at that,

7    and you assume all 51 systems were implanted, that's a

8    3.9 percent failure rate.  That's way higher than the .8 --

9    .08 percent failure rate they were marketing and advertising

10   and proclaiming.

11           And I would also emphasize that Mr. Creagan is going

12   to testify that they -- they didn't sell another single Lima

13   system after these two fractures, so we cannot assume that all

14   those 51 systems were even implanted.  But if we do make that

15   assumption, there's a very high failure rate here.

16           They came from the exact same lot.  They're

17   identical.  The only difference is the proximal body, but we

18   have an expert opinion that the slight differences in the size

19   of the proximal body should make no difference in the

20   biomechanics of this system.

21           So, Mr. Thomas's arguments that it's going to turn it

22   into a mini-trial, that we've been hiding evidence is

23   completely false.  We have not been hiding anything.  They've

24   known about the Burns case.  They've known that we were

25   asserting the evidence of the Burns fracture for over a year

1  now, and they've had plenty of time to take thorough discovery

2  on that particular fracture.  There's not a lot of additional

3  evidence that's coming in.

4          Certainly, they can argue that he was a much larger

5  gentleman than my client.  But my experts can address that, and

6  they can -- they can deal with that.  It's not going to turn

7  this into a much more extended trial merely for that purpose.

8  And the focus is really, what -- when we're talking about a

9  circumstantial case of product liability, this is absolutely

10 relevant.

11         And if Mr. Thomas wants to apply a 403 analysis --

12 FRE 403 analysis, I would encourage the Court to do so.  The

13 probative value of this evidence is critical.  It is not just

14 a -- any time I've ever seen a Rule 403 analysis, it was on

15 something with questionable relevance.  This is absolute

16 relevance, pinnacle relevance to this particular case.

17         And I don't think any prejudice to opposing counsel

18 or to Lima, by having to have additional evidence on

19 Mr. Burns's case, is -- is substantially outweighing the

20 relevance -- the relevance of this particular evidence.

21         And on top of that, Your Honor, I want to -- I want

22 to emphasize that Mr. Thomas says we've never let them -- we've

23 never given them the product.  Well, they have remedies under

24 the Federal Rules of Civil Procedure.

25         My cocounsel was lead counsel for Mr. Burns.  He's

1   already obtained consent from Mr. Burns for disclosure of all

2   his medical records.  They already have all of his medical

3   records from the other case.  There is no -- there is no HIPPA

4   issues here.  And if they simply filed a request for

5   inspection, under the federal rules, they would -- they would

6   have and they will see that particular device.

7              They can't just show up at court at the last minute

8   and say, "Oh, we never asked to inspect it, but they've never

9   let us inspect it in the past."  So, with that, Your Honor, I

10  ask that motion be denied.

11             THE COURT:  Okay.  And you have spent your 20

12  minutes, but I did want to hear argument on your motion to

13  exclude Dr. Wright's --

14             MR. ROSSMAN:  Oh --

15             THE COURT:  -- opinions.

16             MR. ROSSMAN:  -- right.  I'm sorry.

17             THE COURT:  Which leads to my concern that as

18  Mr. Thomas indicated, there's a risk, if we go too far on the

19  Burns fracture evidence, that we get into a mini-trial, and

20  that mini-trial might also include the fact that, if I

21  understand the -- the record correctly, the same doctor,

22  Dr. McGee, performed the surgery on Mr. Burns and Mr. -- as he

23  did on Connell.

24             And so in thinking about the similarities and the

25  substantial similarity, are we going to go down that road as

1    well with regard to Lima pointing out that it was the same

2    doctor who chose the DJO product?

3          MR. ROSSMAN:  Well, I think --

4          THE COURT:  And I see them nodding.  I guess we will

5    go down that road if you let Rossman go down the road.

6          MR. ROSSMAN:  Well, Your Honor, I really don't care

7    if they talk about the fact -- and I think they will.  I think

8    I may even talk about the fact that Dr. McGee installed both or

9    implanted both devices.  That's --

10          I think the mere fact that he implanted both devices

11    is not a big deal here.  But any time -- any time they want to

12    come in, without appropriate expert testimony, and establish

13    that he negligently, or inappropriately, or improperly, or

14    erroneously implanted either device, we have asked -- we have

15    asked and we absolutely believe we're entitled to an absolute

16    exclusion of that type of evidence and argument.

17          THE COURT:  Because it doesn't comply with 610-12?

18          MR. ROSSMAN:  Yes.  And *Jones versus HealthSouth*

19    is -- it couldn't be clearer.  You cannot, in any circumstance,

20    assert a claim, in this state, against a physician, for

21    negligent conduct, without appropriate medical expert

22    testimony.  You cannot do it.

23          *Jones versus HealthSouth* said that.  You can't assert

24    it as a comparative negligence defense.  You can't get the

25    doctor on the special verdict form unless you put an

1    appropriate medical expert on the stand to testify.  And the

2    Idaho Supreme Court has said repeatedly that it doesn't matter

3    how you veil the allegation against the doctor.  You can call

4    him inappropriate, you can call him erroneous, you can call him

5    mistake, and you can call him whatever you want, fraudulent,

6    but you still have to comply with Idaho Code 6-1012.

7              You still have to have admissible medical expert

8    testimony in order to assert that allegation and to have that

9    doctor on the -- on the special verdict form.

10             In this case, they are not even offering a medical

11   doctor to testify.  In fact, the only thing they are offering

12   is an engineer, a very well-respected engineer and a very

13   knowledgeable engineer.  And I certainly believe that this

14   engineer, Dr. Wright, could get on the stand, and he could tell

15   the jury that there were better devices out there for this

16   patient from an engineering -- strictly engineering standpoint.

17   But he cannot take the next step that he took in the

18   disclosure, and that is to say that it was improper for

19   Dr. McGee to choose this device.

20             This device was marketed as an all-comer's device.

21   This is an all-revisions device.  There was no limitation.

22   There should have been a limitation, according to Lima --

23             THE COURT:  Well, I don't know that --

24             MR. ROSSMAN:  -- but there wasn't.

25             THE COURT:  I'm not sure that's relevant.  I think --

1   I -- I want to hear from Mr. Thomas or whoever is going to

2   respond to this, but I don't think Dr. Wright -- I think he's a

3   doctor, a PhD.

4           MR. ROSSMAN:   PhD.

5           THE COURT:   I don't believe his -- he is qualified to

6   render opinions regarding the alleged negligence or comparative

7   fault of Dr. McGee.   But he is, I think, qualified to provide

8   opinions regarding proximate cause without going into -- into

9   the territory of pointing fault.

10          MR. ROSSMAN:   Yeah.   But the problem with proximate

11  cause, Your Honor, is I don't -- I don't want him -- and I

12  don't think he's entitled to get on the stand and say,

13  "Dr. McGee's conduct is a proximate cause."   I mean --

14          THE COURT:   Right.

15          MR. ROSSMAN:   -- they can certainly say, "Well, he

16  can certainly testify from an engineering standpoint why the

17  device failed."

18          THE COURT:   Yes, it was the -- this device itself.

19  And as you mentioned, there were other devices that could have

20  been chosen, and it -- to me, it would be a very fine line that

21  the defendants -- that Dr. Wright will be able to go.

22          MR. ROSSMAN:   Yeah.   And -- and the only two medical

23  doctors, the only two orthopedic surgeons that have testified

24  in this case are Dr. McGee and Dr. Bozic.   And both have said

25  Dr. McGee was will within the standard of care for implanting

1  this device.

2              THE COURT:  But I -- I don't know that that testimony

3  is relevant even coming from your expert.

4              MR. ROSSMAN:  And it won't be.

5              THE COURT:  Or Dr. McGee.

6              MR. ROSSMAN:  And I won't offer it, unless the Court

7  says Dr. Wright can testify.  You know, the plaintiff's medical

8  malpractice lawyer cited me, and I'm sure my medical

9  malpractice clients would love for this Court to enter a -- a

10 ruling allowing Dr. Wright to offer that kind of opinion, but

11 he just can't.

12             That's not the intent of Idaho Code 6-1012.  He's not

13 a medical doctor.  He's not board certified in any medical

14 specialty.  He's never performed surgery in his life.  He

15 doesn't know the national standard of care for surgeons.  He

16 certainly doesn't know the local standard of care.

17             The only thing he relied upon -- even if he were a

18 medical doctor, an orthopedic -- board certified orthopedic

19 surgeon, he still shouldn't be allowed to testify.  I could

20 never get him to testify in state court with -- because the

21 only thing he relied upon was Dr. McGee's deposition, where

22 Dr. McGee said, at the time of the deposition, he performed

23 surgery to a national standard.  He tried to perform to a

24 national standard.

25             There was no discussion about whether or not the

1    local standard of care was the same as the national standard of

2    care at the time the surgery was performed several years

3    earlier.

4            So, I -- with that, Your Honor, I think that's the

5    only other issue, and I'll -- I will again ask the Court to

6    exclude any such testimony by Dr. Wright in this case.

7            THE COURT:  Thank you.

8            Mr. Thomas.

9            MR. THOMAS:  Your Honor, most of my time should be

10   given to Ms. Rosholt and will be.  On the Burns rebuttal, I

11   simply want to make sure the Court saw that last week we did

12   submit a supplemental authority concerning Ninth Circuit

13   authority on statistical evidence.  Picking up where we left

14   off before, discussing in our briefing *Daubert II*, on remand,

15   where the Ninth Circuit talks about proper use of statistics.

16           And in the authority we submitted last week, we have

17   cases including *Morita* and the *MK* case where they talk about

18   very healthy skepticism toward small sample sizes and how

19   prejudicial those fractions can be.  And so there's that legal

20   problem.  And there's the evidentiary problem the plaintiffs in

21   this case do not have a proper expert to explain how you devise

22   the right fraction that is scientifically valid.

23           You know, whether that number is, you know, 2 over 51

24   or is it 3 over 2,261, which is the number of devices Lima sold

25   through DJO, or is it the worldwide number of 21 over 24,500.

1    The ratios vary then from 3.9 percent up to .086 percent.  Very

2    different numbers, very different ratios.  And the absence of

3    that expert is another big problem to their case.  So, that

4    will be the end, for the moment, of my Burns comments.

5            I'd like to turn to Dr. Wright, and I -- I would have

6    to say, with all due respect, it sounds to me like the Court

7    may have already ruled or at least made a decision in her own

8    mind concerning the Wright motion to exclude.  And let me point

9    out, if I may, why that would be an erroneous decision.

10           Under the diversity rules in federal court, beginning

11   with *Erie Railroad versus Tomkins*, *Hanna versus Plumer*, this

12   Court must rely upon federal procedural law, and that includes

13   the Federal Rules of Evidence.  And here, the only way the

14   Court can get where the plaintiff wants to go is through 601

15   dealing with competency.

16           And only under 601, that's the only way you can get

17   to his state statute.  And that says the state law must supply

18   the rule of decision.  Well, Your Honor, that statute, Chapter

19   10 Title 6, is the Idaho Medical Malpractice Act.

20           I can't tell you how many times both sides in this

21   case have briefed and made the following statement to Your

22   Honor.  This is a product liability case.

23           THE COURT:  Okay.  So how do you --

24           MR. THOMAS:  Never has --

25           THE COURT:  How does Lima get Dr. McGee on the

1    verdict form under the product liability statutes?

2              MR. THOMAS:  Under the product liability statutes,

3    the -- the comparative causation, as outlined under *Vannoy*

4    *versus Uniroyal*, permits the comparison of all tortfeasors

5    who's caused or contributed to the accident or injury.

6              THE COURT:  Correct, and then --

7              MR. THOMAS:  So, it's a comparative causation test.

8              THE COURT:  But the only way Dr. McGee becomes a

9    tortfeasor is if he committed medical malpractice.  So, you are

10   back into the substantive law in terms of getting him on the --

11   getting him on the verdict form.

12             MR. THOMAS:  I respectfully disagree.  We have not

13   pled the Idaho Medical Malpractice Act.  The plaintiff has not

14   pled.  It is not anywhere within the four corners of the

15   complaint.  There is no prelitigation screening panel pled or

16   has happened.

17             And most importantly, the genesis of this whole

18   statute, as we showed the Court with the legislative history,

19   goes back to the 1970s when there was a medical malpractice

20   insurance shortfall, and that led to the passage of the Act.

21             And we don't have this situation here.  Dr. McGee

22   will never pay a nickel, no matter what this jury does, because

23   this is not a medical malpractice case.

24             The simple fact is that under federal law, federal

25   evidentiary law, 601, 10 -- 6-10 hundred doesn't supply the

1   rule of decision in this case, because it is not a medical

2   malpractice case.

3            THE COURT:  So, what is --

4            MR. THOMAS:  There is no pay- --

5            THE COURT:  What is the rule of decision that

6   makes -- that potentially could make Dr. McGee a tortfeasor?

7            MR. THOMAS:  The fact that Dr. McGee did not read the

8   IFU.  Dr. McGee did not look at the lack of proximal bone

9   support.  The fact that Dr. McGee had a selection of many

10  brands and types of prostheses from which he could have chosen,

11  and he chose one that allowed excessive loading on an

12  unsupported piece of metal.

13           And as our Dr. Wright -- who actually teaches

14  orthopedic surgeons at the Cornell Medical School -- will

15  testify that selection of that type of device was an erroneous

16  selection of product for this type of patient, particularly

17  where, as here, this patient was very heavy and very active.

18           And so those pieces of evidence of which Dr. Wright's

19  credentials, under 702, clearly meets -- nobody has challenged

20  his standard, his credentials under 702 -- he can testify,

21  because he has knowledge, experience and training.  30 years of

22  the highest standards in the country in the form of Dr. Wright.

23  And he can say that, because he has said it.  He knows what

24  he's talking about.

25           The issue of law for the Court is -- under 601, is

1   Title 6, Chapter 10, supplying a rule of decision.  Is there a

2   patient suing Dr. Wright -- pardon me.  Is there a patient

3   suing Dr. McGee for bodily injury damages?  That's what that

4   statute's talking about, and nobody's doing that here.  It's

5   not pled.  It's not happening.  You simply cannot reach,

6   through the eye of the needle, 601, and pluck --

7                THE COURT:  But you're not answering my question.

8   What tort is it that Dr. McGee purportedly committed?

9                MR. THOMAS:  I think it was --

10                THE COURT:  What tort?

11                MR. THOMAS:  -- negligence.

12                THE COURT:  Okay.  So, who was his duty owed to?

13                MR. THOMAS:  His duty would be owed to his patient.

14                THE COURT:  So you're square back into the medical

15   malpractice arena.

16                MR. THOMAS:  Your Honor, if there were no statute, I

17   would be in medical malpractice common law.  The question is,

18   what about this statute?  Am I under that statute?  And if you

19   read the statute, the answer is no, because there's no

20   patient/plaintiff suing a doctor for failing to meet the

21   standard of care.  That's not happening.  Now --

22                THE COURT:  But you, on behalf of Lima, are trying to

23   prove what the patient would have to prove.

24                MR. THOMAS:  That is true.

25                THE COURT:  So, okay.

1          MR. THOMAS:  But it's not what the statute is talking

2     about.  So, you know, I know --

3          THE COURT:  So you're not --

4          MR. THOMAS:  -- what you're saying.

5          THE COURT:  And I want to make sure.  You're not

6     claiming misuse of the product.  You aren't claiming any of the

7     affirmative defenses under the -- under the product liability

8     statutes.

9          MR. THOMAS:  Well, that -- that's possible, Your

10    Honor.  Frankly, between Ms. Rosholt and I of mixing and

11    matching these motions, I -- I haven't looked at our briefing.

12    I can't recall exactly what our position is.  So, I want to

13    leave that alone for the moment.

14          I do want to affirm, though, one thing Your Honor did

15    say.  And this is consistent.  Even if the Court were to apply

16    6 Chapter 10 and preclude Dr. Wright on standard of care, there

17    are, exactly as you said, proximate causation analyses which

18    differ.  And, in fact, there's an Idaho Supreme Court case

19    which are we cited to Your Honor.  I think it's *Sheridan versus*

20    *St. Luke's*, which says it's a different analysis under

21    proximate cause.

22          THE COURT:  I -- I agree.  I do think Dr. Wright

23    would be able to testify to a certain extent regarding his

24    opinions on proximate cause.

25          MR. THOMAS:  Your Honor, we are getting low on time.

```
 1 │ I know you have things to do, and Ms. Rosholt has a lot to say
 2 │ about the MSJ reply.
 3 │         THE COURT:  Okay.  You did go past your five minutes
 4 │ or whatever into your time, but Ms. Rosholt --
 5 │         MS. ROSHOLT:  And I'll --
 6 │         THE COURT:  -- 10 minutes.
 7 │         MS. ROSHOLT:  -- make it brief, Your Honor.  Thank
 8 │ you.
 9 │         It's in reply strictly to B Triple A -- apologize.
10 │ It's in reply to the B Triple A.  The first thing I'd like to
11 │ point out is that the counsel commented that there is -- that
12 │ we don't look for preemption.  It needs to be express in the
13 │ statute.  I will address that specifically.
14 │         1603 of the B Triple A, the title is General
15 │ Requirement Applicability and Preemption.  It sets forth
16 │ Congress's express preemption of state law, but it does more
17 │ than that.  1603, there was an argument that you've -- that,
18 │ first of all, you know, you -- there's just no way Lima was a
19 │ biomaterials supplier.  And we'll reference that in 1601, which
20 │ is the congressional findings, the term raw materials and
21 │ component parts, in plural, is referenced 21 separate times.
22 │         In Congress's intent and findings, it is Congress's
23 │ intent and findings to protect raw materials and component
24 │ parts suppliers.  1601 --
25 │         THE COURT:  Well, I -- I believe Mr. Rossman
```

1    indicated that if Lima was purely a component part supplier,

2    that then their -- they would not be liable under the BAAA.

3              MS. ROSHOLT:  And if that's Mr. Rossman's position,

4    then -- then I will -- then that's great.  Sixteen-oh --

5              THE COURT:  So, I guess the next question is, is that

6    a question of law or fact or combined for the Court --

7              MS. ROSHOLT:  It's a question --

8              THE COURT:  -- to determine whether Lima was a

9    component part supplier or an implant manufacturer.

10             MS. ROSHOLT:  Thank you, Your Honor.  And it's a

11   question of law, and it's a question of statutory

12   interpretation as applied to the undisputed facts.

13             We have the declaration of Michele Pressacco

14   identifying that Lima was -- did not register, was not required

15   to register, and has never been the subject of an FDA letter

16   requiring them to register.  And then we went onto the facts.

17             So, we'll -- 1603, as identified, provides that it

18   applies in any claim.  Any civil action, whether in federal or

19   state court, on the basis of any legal theory for harm caused

20   directly or indirectly by an implant, 1603(b)(1).  So, we are

21   squarely within the B Triple A.  It must apply.

22             The B Triple A, as set forth in the case of *Daley v.*

23   *Smith & Nephew*, explained that the B Triple A, Congress set

24   forth the specific definitions of who is and who are not the

25   players; the material supplier, manufacturer, and the seller.

1          I heard that the term manufacturer doesn't pull in
2     the term that we are using, which is identified in Section 360
3     of the FDCA, and that -- I wouldn't make reference -- is not --
4     not accurate.
5          316, Section 1602.  Section 1602-6 states that the
6     term "manufacturer" means any person who, with respect to an
7     implant, is engaged in the manufacture, preparation,
8     propagation, compounding, or processing as defined in
9     360(a)(1).
10         360(a)(1) provides that specific definition.  It
11    shall include repackaging, labeling, and the device packaging
12    in furtherance of distribution.  It -- the B Triple A is
13    congruent with the FDC and the FDA overlay, and we've
14    identified this in our opening brief.  The FDA takes the
15    position as follows:
16         Questions they ask in determining who needs to
17    register or list a device.  "Are you the manufacturer of
18    components that are not otherwise classified as a finished
19    device that are distributed only to a finished device
20    manufacturer?"  80 -- that's at 21 CFR 807.65(a).
21         "If you are that party, you do not need to register
22    or list the device.  You are not a finished device
23    manufacturer."  If you are a manufacturer of accessories or
24    component parts that package/label for commercial distribution
25    for health-related purposes to an end user, 807.20(a)(6)

1    provides that you are the party required to register and list

2    the device.  And that's exactly what happened here.

3            There was some confusion as it relates to the

4    component parts that make up this hip system.  Identified in

5    Exhibit P to the declaration of Erica Phillips is the DJO

6    delivery ticket in this case identifying the component parts.

7    They are component parts in separate packages, including the

8    Lima distal stem, the proximal body, and the femoral head.  As

9    set forth in the 510(k) and -- correct.  The femoral head was

10   not -- was not made or manufactured by Lima.

11           As set forth in the 510(k) application submitted by

12   DJO and attached as Exhibit D to Docket 113-02, in addition to

13   identifying itself as the manufacturer of record, they

14   explained that the device is their module revision hip system.

15   That the component parts are made up of a modular stem with a

16   Morse taper, and that those component parts are to be combined,

17   as they were in this case, with compatible components

18   previously cleared by DJO, which include the following,

19   identified in that box right there.

20           It is also consistent with the operating note, which

21   is in Docket 104-37, identifying -- and I won't go through it,

22   because we are out of time -- each of the component parts that

23   the surgeon selected, assembled, and implanted in Mr. Connell's

24   case.

25           Your Honor, the terms in the B Triple A have specific

1   meaning and specific definition.  It is clear that based on the

2   reading of those terms, Lima is a biomaterial's supplier, not a

3   manufacturer, and that plaintiffs concede that there is no

4   evidence that Lima failed to comply with the contractual

5   specifications.

6          Now, they point to -- and I'm on my last point, is

7   the deposition of Caleb Creagan for the concept that the Court

8   should -- should supplant the direct definition of what it

9   means to manufacture or to be a manufacturer, because

10  Mr. Creagan believed that he was selling a Lima product.

11         Your Honor, Mr. Creagan is the Rose & Associates

12  distributor responsible for marketing and selling this product

13  in the United States.  Now, Mr. Creagan has testified in this

14  case that he didn't read the instructions for use that must

15  accompany every package.  However, had Mr. Creagan read those

16  instructions for use, as identified in Exhibit J, the following

17  would have been noted.

18         This is a DJO module revision hip system.  It has

19  component parts by DJO.  In addition, he would have recognized

20  the contraindications.  But more importantly, that DJO

21  identifies that its systems are manufactured by EnCorps Medical

22  for itself.  "And for further information regarding the use of

23  the DJO surgical hip systems, please contact your distributor."

24         That is all I have to state on this point.  I thank

25  you for your time, Your Honor.  I'm happy to take any

1   questions.

2           THE COURT:  Let me just -- this is a -- not

3   necessarily material, but I want to make sure it's factually

4   accurate.

5           MS. ROSHOLT:  Correct.

6           THE COURT:  Were the -- was the hip system or the

7   parts provided to St. Al's or to Dr. McGee?

8           MS. ROSHOLT:  That delivery ticket went to -- went to

9   St. Alphonsus.

10          THE COURT:  St. Alphonsus?

11          MS. ROSHOLT:  That's correct.

12          THE COURT:  Thank you.  Okay.  Let's see.  Where are

13   we?  We are on --

14          MR. ROSSMAN:  I think we are fine on Dr. Wright.  I

15   think -- I don't think I need to offer a whole bunch, but I

16   just have a couple points.

17          Your Honor, I fail to even understand Mr. Thomas's

18   argument on this issue.  You can't establish that Dr. McGee was

19   a tortfeasor without admissible expert testimony.  And I think

20   he tried to argue that there is no -- that you don't apply

21   state law in -- in -- or that 6-1012, 1013 don't apply in a

22   federal case.  That's absolutely not true.

23          Federal Rules of Evidence 601 provides for it.  The

24   Idaho -- the Ninth Circuit Court of Appeals decision in

25   *Liebsack versus US*, 731 F.3d 380 [sic] in 2013 specifically

1   held that.  And if you look at *Jerden versus Amstutz*, 430 F.3d

2   1231, which is a Ninth Circuit case in 2005, it's almost

3   identical to this case.  It was applying Oregon's locality rule

4   and whether their locality statute applied to the admissibility

5   of expert testimony, and the Court said it does.  So, I don't

6   think there should be any dispute on that.

7         And some -- the argument that -- that you should have

8   some lower threshold requirement of admissible evidence to

9   prove a comparative negligence defense than the direct claim

10   itself seems absurd to me.

11         Why would -- why would I, as a plaintiff, be held to

12   a different admissibility standard than the defense that are

13   trying to deflect damages proven against their client by

14   putting somebody else on the verdict form.  And that's what the

15   Court expressly direct -- the Idaho Supreme Court expressly

16   addressed in *Jones versus HealthSouth* when they said a

17   comparative negligence defense of medical malpractice still

18   requires admissible expert testimony.

19         THE COURT:  Thank you.

20         Okay.  Now, Lima, you have five minutes.  You can

21   choose which of your other motions you'd like to argue, either

22   the motion to exclude Dr. Sharlin's testimony or the motion for

23   a judgment on the pleadings, or both, I guess, if you can do

24   that in five minutes.

25         MR. THOMAS:  Yes.

1              THE COURT:  And just so you know, Ms. Tate has been

2      informing me that counsel's past their time, but --

3              MR. THOMAS:  Oh, okay.  I'm sorry.

4              THE COURT:  -- I've been allowing you to do that,

5      just --

6              MR. THOMAS:  Thank you for the kindness.

7              THE COURT:  -- so you know that she is doing her --

8      carrying out her responsibility.

9              MR. THOMAS:  Well, I worried about that, Your Honor.

10             Your Honor, to respond to the Wright point, the

11     *Liebsack* case from the Ninth Circuit is an Alaskan case, which

12     was a medical malpractice case.  Therefore, it is not

13     applicable.

14             Number two, he cites to an Oregon case to the Ninth

15     Circuit.  Take a look, please, at the 2013 decision of the

16     Oregon Supreme Court, *Trees versus Ordonez*.  It specifically

17     allowed a biomechanic to testify opposite an orthopedic

18     surgeon.

19             Okay.  Let's go to the only motion I really want to

20     talk about, because the motion for judgment on the pleadings

21     under Lima USA doesn't warrant much time.  The Court can rule

22     now and grant, or it can convert to a 56.  But either way, when

23     an entity like Lima USA did not exist until after all of the

24     conduct at issue, I mean, why are we wasting anybody's time on

25     that -- on that motion.

1              Let me take about Sharlin, Your Honor.  There was an

2    earlier reference by Mr. Rossman about the Sharlin declaration.

3    Well, Your Honor, there -- Your Honor, there is no Sharlin

4    declaration.  He never came up with a declaration.  And that's

5    because he frankly didn't have anything to say for a case in

6    chief opinion as to my client.

7              The Court well knows, from our briefing, that his

8    opening report on March 1 was critical of DJO and only DJO.

9    And he was given an assignment to look at this case from an FDA

10   regulatory point of view as to both defendants.  And his -- his

11   answer, his report of March 1st, pinpointed DJO only.

12             And frankly, it's common sense.  As we've now

13   explored and frankly cross-conceded multiple times, DJO was a

14   registrant.  It was the one who got clearance.  It was the one

15   who had to maintain MD -- MDR reports with the FDA about

16   adverse events, and it was the one who, under the Biomaterial's

17   Supplier Act, is responsible to any tortfeased -- tortfeasor

18   under the court procedures.

19             So, the fact is, Rule 26 is abundantly clear that the

20   expert report deadline is expecting all -- complete listing of

21   all the opinions, and he did so, and he didn't mention my

22   client.

23             The only thing that changed five months later, when

24   he came back around and issued the same report a second time,

25   this time cross out L -- cross out DJO, put in Lima, is the

1    settlement between the parties.  And, Your Honor, that would

2    create some very interesting cross-examination.  How we do it,

3    we'll talk about later, if need be.  I hope not.

4         I mean, the fact is Mr. Sharlin just shouldn't be

5    allowed to change horses, after a settlement, to reverse his

6    field 180 degrees.  It's not fair, and it doesn't comply with

7    26(a)(2).  And frankly, Rule 37(c)(1) is self-executing and

8    authorizes this Court to exclude his rebuttal document, because

9    it wasn't rebuttal.

10        Your Honor, are you taking up separately punitive

11   damages or are we -- is this --

12        THE COURT:  Yes, Mr. Rossman is going to --

13        MR. THOMAS:  Okay.

14        THE COURT:  -- if he wants to, argue that motion.

15        MR. THOMAS:  Okay.

16        THE COURT:  And then you will have two minutes to

17   respond to that.

18        MR. THOMAS:  Very well.  Then I'll sit down.

19        Do you have more, Andrea?

20        MS. ROSHOLT:  No.

21        MR. THOMAS:  Okay.  Thank you.

22        THE COURT:  Mr. Rossman, you have five minutes to

23   provide support for your motion to amend to add punitives

24   and/or to respond to the motion to exclude Dr. Sharlin's

25   rebuttal.

1          MR. ROSSMAN:  And I'll promise the Court I will stick

2     exclusively to that particular issue.  There's a reason why the

3     moving party's entitled to the reply, is that they get the last

4     word.  They have the burden.

5          So, as relates to Dr. Sharlin, it's not so easy as to

6     just say Dr. Sharlin -- or Mr. Sharlin didn't offer any

7     opinions about Lima in his original report.  Well, the problem

8     that they have is, yes, Mr. Sharlin offered a lot of opinions

9     in his original report as to the FDA regulatory violations and

10    the problems.

11         So, what they did is they came back with Doctor --

12    with Mr. Shapiro, who is an FDA expert as well.  And

13    Mr. Shapiro said, "Well, all those FDA regulatory problems,

14    some of them are really problems, some of them are not, or

15    maybe none of them are problems, but those were DJO's problem,"

16    is effectively what he said.

17         And that once Mr. Shapiro takes the stand and offers

18    those kinds of opinions, Mr. Sharlin is absolutely entitled to

19    come back and say, "Well, wait a minute.  That's not true.  I'm

20    directly responding only to Shapiro's opinions.  That's the

21    only thing I'm testifying to, and I'm saying that statement

22    that it was strictly only DJO's responsibility is just simply

23    not true.  It's not true under the supply agreement, and it's

24    not true under the FDA regulations."  And that's all the

25    rebuttal report provided.  And it is appropriate rebuttal

1   testimony.

2              This is further an issue that is better decided as we

3   approach -- approach trial in the case on motions in limine and

4   things like that.  But an absolute exclusion from Mr. Sharlin

5   testifying at trial, he didn't offer any new opinions that were

6   not prompted or in direct response to opinions offered by

7   Mr. Shapiro.  Thank you, Your Honor.

8              THE COURT:  What about --

9              MR. ROSSMAN:  Hopefully, I was within five minutes.

10             THE COURT:  What about the fact that it was untimely,

11  the rebuttal?  My understanding the claim by Lima is that you

12  were late.

13             MR. ROSSMAN:  I don't think I remember that argument.

14  I guess I would offer this, Your Honor.  I --

15             THE COURT:  You probably don't remember it --

16             MR. ROSSMAN:  -- I don't think -- I didn't think we

17  were late.

18             THE COURT:  -- because you didn't --

19             MR. ROSSMAN:  I don't recall being late.  If we were

20  late, it had to have been a day -- within a day and by mistake

21  or miscommunication or something.  I will also say that it has

22  not put them in any difficult position whatsoever in this case.

23             They have had plenty of opportunity to review those

24  opinions.  In fact, they went to Washington, DC, and they

25  deposed Mr. Sharlin.  And what's funny, is they didn't even ask

1  him a single question about his rebuttal report with a full and

2  fair opportunity to take that discovery.  Thank you, Your

3  Honor.

4          THE COURT:  Okay.

5          MR. THOMAS:  Your Honor, in fairness to Mr. Rossman,

6  he wasn't late to my knowledge.

7          THE COURT:  Oh, he wasn't.  Okay.

8          MR. THOMAS:  The problem with the report, as I

9  understood it, was that the Shapiro expert for the defense

10 focused solely upon the law and regulations and practices of

11 the FDA.  That was his sole basis of critique.  And he

12 expressly said, "I am not looking at any contract, any supply

13 agreement."

14          THE COURT:  Okay.

15          MR. THOMAS:  Then comes the second report from

16 Sharlin.  He cites that very sentence that my expert is not

17 looking at any supply agreement or any contract, whereupon he

18 goes ahead and makes his entire rebuttal based upon the supply

19 agreement and ignores the totality of the regulatory critique

20 by Shapiro.

21          And so in that sense, it was nonresponsive.  And if

22 you call that late, fine.  But in terms of the clock, I don't

23 think we critiqued plaintiff on that point.

24          I do note, Your Honor, that I'm out of time, and I

25 appreciate the flexibility.

1          THE COURT:  Mr. Rossman just --

2          MR. ROSSMAN:  Wiping the sweat off my brow, Your

3    Honor, yes.

4          THE COURT:  -- wiped the sweat off his brow on the --

5    the allegedly late disclosure.

6          Okay.  Mr. Rossman, I'll hear your argument on the

7    punitive damages.  And then Mr. Thomas, you will have an

8    opportunity to respond.

9          MR. THOMAS:  I thought I'd let Mr. Hurst take that

10   one.

11         THE COURT:  Okay.  Mr. Hurst.

12         MR. HURST:  Which one?

13         MR. THOMAS:  Never mind.

14       (Laughter.)

15         MR. HURST:  I don't think you want that.

16         MR. ROSSMAN:  Your Honor, I realize the Court's been

17   here.  I don't -- I don't want to -- I don't want to spend a

18   lot of time, but I do want to afford enough time and a

19   sufficient period of time to this particular motion, because

20   it's a very critical motion in this case, in any product

21   liability case.

22         This is not a case of simply a defective product.

23   It's not a straightforward, simple, strict -- strict

24   negligence -- or strict liability, product liability case where

25   there's a defective product.  This is a case where there --

1   unfortunate, and I've seen it in product liability cases all

2   too often.  This is a case where there was calculation.  This

3   is a case where there was knowledge.  This is a case where they

4   had every opportunity to appreciate and anticipate this type of

5   device failure and did nothing to prevent it.  Nothing --

6   nothing more than the manufacture of the product.  This is a

7   case with that intersection of bad act and bad state of mind.

8           As the Court knows, the standard under Idaho Code

9   6-1604, that this Court is to decide, as the gatekeeper, is

10  whether there's a reasonable likelihood of plaintiff proving

11  facts at trial sufficient to support an award of punitive

12  damages.  And I can't emphasize enough, when I argue this

13  motion, how important that standard is.

14          The inquiry of the Court is whether or not when we

15  have -- I was going to say 12 -- when we have six jurors, plus

16  maybe one or two alternates, at trial of this case, the

17  question for this Court is whether there's a reasonable

18  likelihood that jury could find, by clear and convincing

19  evidence, an award for punitive damages.  And that is the end

20  of the inquiry.

21          We're not asking this Court, we're not placing that

22  burden on the -- on this Court of making that ultimate

23  determination, because it's not your responsibility.  It's the

24  jury's responsibility.  And that is -- that standard is spelled

25  out in the statute in where it says that the Court needs to

1    determine whether a re- -- there is a reasonable likelihood

2    that the plaintiff can prove facts sufficient to support an

3    award of punitive damages.

4          There must be proof by clear and convincing evidence

5    of oppressive, fraudulent, malicious, or outrageous conduct.

6    If a reasonable jury could award punitive damages, could find,

7    by clear and convincing evidence, oppressive, fraudulent,

8    malicious, or outrageous conduct, we are entitled to an

9    amendment, and we're entitled to make that argument in front of

10   this jury and let the jury make that determination whether or

11   not this is an appropriate case for punitive damages.

12         I don't want -- I'm not trying to minimize the impact

13   of Idaho Code 6-1604.  It is a very important statute.  The

14   legislature considered it very important.  And I'd also --

15   absolutely, practicing 25 years, I appreciate that it is the

16   rare case where punitive damages are offered before a jury and

17   where -- it is the rare case where a jury gets the opportunity

18   to award punitive damages.

19         But you see punitive damages in product liability

20   cases for the simple reason that sometimes manufacturers and

21   product sellers make calculated determinations on people's

22   lives, when they know that there is a real likelihood, a real

23   possibility that their actions could seriously injure or kill

24   somebody, and they do it anyway.  Because it's economic

25   decision rather than a humanitarian decision.  And that is the

1   kind of situation we have in this case.

2        THE COURT:  So, what -- what is the evidence in the

3   record that would raise to -- rise to the level of oppressive,

4   fraudulent, malicious, or outrageous?

5        MR. ROSSMAN:  So, first, under the supply agreement,

6   Lima's got the obligation to work with DJO to obtain FDA

7   clearance.  FDA clearance, the FDA clears not just the product

8   itself that's been manufactured.  It also clears the

9   instructions for use.  And it requires that those instructions

10  for use be sufficient to allow the surgeon to make an educated

11  choice in using the device.

12        And what's interesting is their expert's saying he

13  made a poor choice in this particular case.  Well, that's the

14  point.  That's the reason for the IFUs.  It's to allow that

15  surgeon to make an educated choice.  To identify what they

16  know, what they absolutely know are real risks of not just a

17  problem with the device, a complete failure of the device to

18  where it fractures within someone's femur and has to be fished

19  out by extensive osteotomies almost to the knee, almost through

20  the entire femur in order to fish out that piece of that stem.

21  Because a revision stem is a long stem.  It's not a primary

22  that is a much shorter stem.  It's very difficult to get out.

23  And if you -- it increases the mortality and morbidity of that

24  procedure substantially.

25        Dr. McGee decided he wouldn't do it here.  I submit

1  that he probably couldn't do it here.  The best approach was to

2  do what they did and send him to Salt Lake City where a very

3  skilled surgeon was able to ultimately remove the device.

4          But they knew that that device had been failing the

5  recommended testing standards, fatigue testing standards that

6  are provided by the FDA.  They knew it was failing those.  And

7  they knew DJO was not communicating that to the FDA.

8          They knew that this particular device was intended

9  really for only the most healthy of individuals.  People with a

10  BMI, a body mass index, less than 28, which is -- is, according

11  to Dr. Bozic, he couldn't remember the last patient he treated

12  that had a BMI under 28.  It is -- Lima knew that its product

13  was not designed -- it was not fit for someone with a BMI that

14  was over 28.

15          And if you look at Mr. -- I think it was Mr. -- oh,

16  we put it in the record.  One of their representative's email

17  correspondence to DJO, his communication was, "We don't just --

18  don't just not want this device implanted in obese, morbidly

19  obese people.  We don't want it implanted in overweight people.

20  We want an absolute contraindication for this device to be

21  placed in anyone with a BMI over 28."

22          That was -- that was Lima's representation, because

23  Lima knew that it had -- that it was not designed for a heavier

24  patient that put more stress on the device.  It's a modular

25  device.  It's a modular device that had been failing,

1  repeatedly failing the FDA recommended fatigue standards.  And

2  they were really concerned about exactly what happened in this

3  case and the Burns case, and that is the device fracturing.

4           THE COURT:  Lima was concerned.

5           MR. ROSSMAN:  Lima was concerned.

6           THE COURT:  But wasn't it DJO's responsibility to --

7  to create or change the IFUs?

8           MR. ROSSMAN:  Yeah.  And that's interesting.  That's

9  where we come in on the motion for partial summary judgment,

10 too, under the product liability statute.

11          That would be a valid claim of comparative

12 negligence, except, according to the Idaho legislature, where

13 they expressly or impliedly consent to the alteration or

14 modification.  And that is exactly what happened here.  Lima

15 had an IFU that was calling for an absolute contraindication

16 with a BMI over 28.

17          DJO wasn't putting it into their IFUs.  And according

18 to Tiffany Huddle, their representative, they didn't want to

19 put it in there, because they were worried that it would limit

20 the market for the product.  That was the only reason.  Lima

21 found out about it, and they start firing off emails saying

22 "Hey, here's our IFU.  We want an absolute contraindication.

23 We don't want this in -- in people who are obese.  We cert- --

24 we don't even want this in people that are overweight."

25          And DJO ultimately makes a determination, "We're

1    still not going to make that.  We're not going to put that in

2    there."  But there is no dispute in the record whatsoever,

3    there is absolutely not a shred of evidence in this case that

4    Lima did not know that DJO refused to put that BMI limitation

5    into the ultimate IFU.

6            In fact, Lima was fully aware of it.  They were told

7    of it.  And they knew that DJO was marketing this to people

8    with a BMI -- with no BMI limitation, much less a BMI

9    limitation of 28.  And they continued to sell them product for

10   an extended period of time knowing that.  And that's where that

11   express or implied consent to the alteration comes in under the

12   Idaho compare- -- product liability comparative negligence

13   statute.

14           And that is what is -- what is the most abhorrent

15   part of this whole case, Your Honor, is the fact that the

16   manufacturer, the entity that actually created the device knows

17   of its limitations, has seen the failures in testing, is -- is

18   asking the marketer or the distributor or the -- according to

19   the FDA, the manufacturer -- domestic manufacturer of the

20   product to put an absolute BMI limitation, a very low BMI

21   limitation into the IFUs, and to communicate that to surgeons,

22   so that surgeons can make that educated decision on choice of

23   the implant.  Yet they know that DJO's not putting it in there,

24   and they just keep selling them product.

25           I'm sorry.  A simple email is not an indemnification

1      agreement.  It's not a waiver.  It's -- it is -- it is a

2      knowing consent to an alteration of the product, a marketing of

3      the product for a purpose for which it was not created.  A

4      purpose that they knew created a substantial risk of harm that

5      actually resulted in this case.

6             Idaho Supreme Court defines reckless as someone

7      performing conduct where they knew or should have known that

8      they were exposing someone to a substantial risk of harm with a

9      substantial likelihood that that harm would result.

10            That absolutely applies to this case.  They knew the

11     absolute risk that they were trying to prevent occurred in this

12     case.  That's -- that's the injury that ultimately happened in

13     this case.  The device failed.  They knew about it.  They knew

14     that it was a distinct possibility.  They knew that it was

15     perhaps even a likelihood that this was going to happen.  They

16     asked for it to be changed.  They knew it wasn't changed, and

17     they continued selling that product.  They chose dollars over

18     lives is exactly what this company did.

19            And that is the kind of -- that is the kind of

20     conduct that punitive damages are intended to deter.  And

21     without an award of punitive damages or at least without the

22     opportunity to -- to ask a jury for punitive damages, I think

23     the -- the purposes of justice are not served in this case.

24     Thank you.

25            THE COURT:  Thank you.  I saw Mr. Hurst indicating

1    that he did not want to argue.  So, that's either Mr. Thomas or

2    Ms. Rosholt.

3            MR. THOMAS:  Mere argument of counsel is not

4    evidence.  Mr. Rossman began this process in April of 2018

5    deposing witnesses in Italy and has not followed the true issue

6    on testing.  ISO 7206:06, to which he is making reference,

7    tests a different part of the product for strength.  It is not

8    at issue in this case.  Never has been.  His own expert,

9    biomechanic Truman, admits as much.

10           The test that is germane to this case is 7206:04.

11   And my client passed that test every time.  And that's

12   uncontested in this record.  I'm offended that we're going down

13   this pig trail after his own expert concedes the point.

14           In fact, his own expert Truman says, "There's nothing

15   wrong with the product you made.  It shouldn't have been

16   marketed to these people.  But in normal patients, it's fine."

17   And we've quoted that evidence in the record.

18           That's the evidence, Your Honor.  Let's get back to

19   the law.  This is a disfavored remedy.  The Court knows about

20   the history of the Idaho legislature in its tort reform efforts

21   of 1987 and 1991 creating this extremely rare statute requiring

22   this Court to hold a hearing.  And it's a mini-hearing.

23           The Court is both looking at the law and weighing the

24   evidence.  Clear and convincing evidence, which under the

25   *Wind* -- the *Four Winds* decision defines clear and convincing as

1    highly probable, reasonably certain.  We are nowhere near that.

2    Your Honor, we don't even have a supporting affidavit

3    supporting this motion.

4         And the *Walston* factors may or may not be

5    determinative, but they are very powerful factors.  And *Walston*

6    number one is a crucial missing link; an expert witness to say,

7    "Here's the standard.  Here's where the deviation is.  And, no,

8    it's not a little bit.  It's not negligence.  It's not gross

9    negligence, because neither one of those is good enough as a

10   matter of law.  No, it's an extreme, gross deviation."

11        We have none of that benchmarking, none of that

12   intelligent, precise testimony is sponsoring this motion.  It

13   is a naked motion based on pure argument of counsel.  And I

14   admit that Mr. Rossman is good at his trade, but it shouldn't

15   fool this Court to look at the evidence.  That's the truth, and

16   that's where justice is.

17        Furthermore, Your Honor, this -- I am not ashamed or

18   defensive one iota that my client went out of its way to urge

19   DJO to raise its bar in its IFU.  But the undisputed record

20   evidence is this.

21        The IFU that was presented was cleared, March 3,

22   2010, by the FDA.  It was cleared.  And as I put in our

23   brief -- and I have forgotten which one, but you have a great

24   law clerk.  I'm sure she can find it.  Just take a look at it.

25   There are, in these specific warnings -- had Dr. McGee read the

1    thing.  He admits he didn't.  Never does.  That clearly show

2    that there are risks that were applicable to this extremely

3    active, large patient.

4         It wasn't until his deposition.  Dr. McGee gave a

5    deposition, November 2017, where he found out for the first

6    time that his patient was playing basketball and was a karate

7    black belt.  Didn't even know that.  That's not in the record,

8    but we can put it in.  It's in the deposition.

9         So, Your Honor, I -- I'm really offended by this.

10   The good -- the good news about this motion is we -- we

11   ferreted out and forced a concession.  They had to concede no

12   agency is alleged.  No third-party beneficiary.

13        They are trying to essentially settle with DJO and

14   then ride that same horse again against us as if we were their

15   agent, and we were not.  They didn't plead it, and the supply

16   agreement doesn't support it.  And if anything, the email

17   chain, beginning in February 2011 by the Lima employee Stefano

18   Adami, shows a good intent.  They cared about the patients.

19   Thank you.

20        THE COURT:  Thank you.  Anything further,

21   Mr. Rossman?

22        MR. ROSSMAN:  Yes, ma'am.  Yes, Your Honor.

23        I'm sorry Mr. Thomas is offended, but I think Lima's

24   conduct in this case is more offensive than anything that this

25   Court has heard.

1             And the best evidence of harm -- of Lima's harmful

2     state of mind is its own words.  Its own words, where it says,

3     "We don't want this product -- or we are concerned about

4     failure of the product," he says, "and we don't want this

5     product implanted in any obese people, not even just obese

6     people, anyone who is overweight.  And we want an absolute

7     contraindication of a BMI of 28."

8             If that's not the best evidence of a harmful state of

9     mind, I don't know what is.  And again, what was missing from

10    Mr. Thomas's argument to this Court, in response to my

11    argument, was any evidence whatsoever that Lima was unaware

12    that DJO refused to include that BMI limitation in their IFU.

13            They knew it, and they continued selling that product

14    knowing that DJO was not going to be communicating this BMI

15    limitation.  And as we talked about with Mr. Sharlin's

16    testimony, when the FDA clears IFUs, it is an absolute

17    obligation of the manufacturer, whoever is obtaining the

18    clearance, absolute requirement that they communicate -- that

19    the IFU accurately communicate the limitations of the product

20    to allow the surgeon to make an informed decision.

21            This IFU did not do that, because it didn't include

22    the BMI limitation, the thing that Lima was absolutely

23    concerned about.  And opposing counsel wants to point to the

24    fact that Dr. McGee didn't read the IFUs.  Well, no surgeon

25    ever reads the IFUs.  The IFUs are really intended for the

1   ultimate representative, that is sitting there in surgery,

2   present during surgery, to know and understand the product that

3   he's selling to the surgeon.

4           And if you look at Caleb Creagan's testimony, it

5   tells a completely different story.  Caleb Creagan says, "If

6   I'd known about a BMI limitation, that product would have never

7   been sold to Dr. McGee, and it would not have been placed in my

8   client."

9           So, that intersection of a bad act and a harmful

10  state of mind is absolutely present in this case.  The minute

11  that DJO knowing -- or the minute that Lima knowing that it had

12  a product with a -- in their own words -- a significant risk of

13  failure, in their own words, required a BMI limitation of 28

14  and that it not be implanted in someone that was overweight,

15  and then they allow them to continue to do that, not just

16  market it to people with a BMI over 28, market it with no BMI

17  limitation.

18          That's a harmful state of mind, because what

19  ultimately happened in this case is exactly what they were

20  concerned about happening, and they allowed it to happen.  And

21  in fact they -- they were a very active participant in it

22  happening.

23          All they had to do was tell DJO, "Look.  We're not

24  selling you product unless you put this BMI limitation in

25  your -- in your IFUs."  But DJO refused, and they continued

1  selling.  That is an active, expressed, implied consent and a

2  harmful state of mind.  Thank you, Your Honor.

3           THE COURT:  Before -- I will ask you to stand up one

4  more time, Mr. Rossman.  Are you -- the one thing I haven't

5  heard is a response to the motion for judgment on the

6  pleadings.

7           MR. ROSSMAN:  Oh.

8           THE COURT:  Which --

9           MR. ROSSMAN:  Yeah, I guess I'd just defer back to

10  the briefing, Your Honor.  They filed it as a -- as a motion

11  for judgment on the pleadings.

12           THE COURT:  Well, do you -- is there any -- are there

13  any facts that contradict that Lima USA did not even start

14  doing business until after the surgery that's --

15           MR. ROSSMAN:  Well --

16           THE COURT:  -- where the device --

17           MR. ROSSMAN:  -- there are no facts --

18           THE COURT:  -- where the device was --

19           MR. ROSSMAN:  -- in the record --

20           THE COURT:  -- implanted.

21           MR. ROSSMAN:  -- because it was filed a motion for

22  judgment on the pleadings.  But if you're asking me, as an

23  Officer of the Court, whether or not I have facts that -- I

24  really don't.  I'll be honest.

25           THE COURT:  You were pretty straightforward in your

1   response, so --

2          MR. ROSSMAN:  I'm not going to --

3          THE COURT:  You're just not going to --

4          MR. ROSSMAN:  I'm not going to paint a --

5          THE COURT:  -- concede.

6          MR. ROSSMAN:  -- fuzzy picture --

7          THE COURT:  you're not --

8          MR. THOMAS:  -- for the Court.

9          THE COURT:  -- going to concede.

10          MR. ROSSMAN:  I'm not going to make a

11   misrepresentation.  And we don't -- we don't have that.  I was

12   just confused by the fact that they filed it as a motion for

13   judgment on the pleadings, and -- but, yes.

14          No, we don't have anything at this point in time as

15   to whether or not they were operating prior to that -- that

16   date that they had the certificate of incorporation.

17          THE COURT:  Thank you.  Okay.  Well, with that, I

18   appreciate all of your arguments.  Is there anything additional

19   that you'd like to take up, Mr. Thomas?

20          MR. THOMAS:  I'm just standing to honor the Court as

21   you recess.

22          MR. ROSSMAN:  Well, I did, Your Honor.  I had that

23   motion for partial summary judgment on the --

24          MR. THOMAS:  Denied.

25          MR. ROSSMAN:  What's that?

1          MR. THOMAS:  Denied.

2          THE COURT:  Denied.

3      (Laughter.)

4          MR. ROSSMAN:  Oh, thank you, Your Honor.

5          THE COURT:  I think you argued it.

6          MR. ROSSMAN:  On the comparative negligence.

7          THE COURT:  I think you argued it indirectly.

8          MR. ROSSMAN:  Indirectly, yeah.

9          THE COURT:  So, I understand.

10          MR. ROSSMAN:  I hope you understand.

11          THE COURT:  I do.

12          MR. ROSSMAN:  We are really banking on the product

13    liability statute and the specific provisions in there, and the

14    *Vannoy* case is completely distinguishable, because it's two

15    different manufacturers of two different tires, where this is

16    all the same manufacturer and the same product going all the

17    way through the chain of -- chain system.

18          Thank you, Your Honor.

19          THE COURT:  And I don't know --

20          MR. THOMAS:  Let me --

21          THE COURT:  -- who was it that mentioned --

22          MR. THOMAS:  -- let me say if I'm --

23          THE COURT:  -- that I have a wonderful law clerk that

24    will find that for me --

25          MR. THOMAS:  Okay.

1          THE COURT:  -- if I need it, so -- but we have -- we

2     have worked through and talked through all of the motions, and

3     so --

4          MR. THOMAS:  Your Honor, I think your law clerk will

5     also find 6-802 *Vannoy* and *Boswell* will help answer this

6     gentleman's final comments.

7          THE COURT:  Okay.

8          MR. ROSSMAN:  And then in reply, I think *Hopper*

9     *versus Shafford* and *Bershka versus St. Alphonsus* will also

10    provide, as we've cited in the brief, considerable additional

11    information.  Thank you, Your Honor.

12         MR. THOMAS:  Thank you, Your Honor.

13         THE COURT:  All I can say is that if this matter goes

14    to trial, it will be very interesting, and I'll be watching,

15    capable and competent counsel throughout.

16         I'm still disappointed that you didn't need a

17    discovery master in Italy.  With that, all -- all of the seven

18    motions are under advisement and --

19         MR. ROSSMAN:  Thank you, Judge.

20         THE COURT:  -- we'll get a decision out.  Thank you,

21    counsel.

22         MR. THOMAS:  Thank you, Your Honor.

23         MR. ROSSMAN:  Thank you, Your Honor.

24       (Recess, 3:24 p.m.)

25

```
 1                              --oOo--

 2                    TRANSCRIBER'S CERTIFICATE

 3       I, KATHERINE EISMANN, certify that the foregoing is a

 4  correct transcript from the official electronic sound recording

 5  of the proceedings in the above-entitled matter.

 6

 7  Date:  November 7, 2019.

 8                              _____

 9                              Katherine Eismann, CRR, RDR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```